GRAY, Respondent, *v.* FOX WEST COAST SERVICE CORPORATION et al., Appellants.

(No. 6,979.)

(Submitted January 6, 1933.   Decided February 1, 1933.)

[18 Pac. (2d) 797.]

398

*Messrs. Freeman, Thelen & Freeman* and *Mr. L. C. Myers,* for Appellants, submitted a brief; *Mr. J. P. Freeman* argued the cause orally.

*Mr. Timothy Nolan,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

Appellants, defendants in the court below, after denial of a new trial, have appealed from a judgment against them in the district court of Silver Bow county.

The cause of action was based upon an injury alleged to have been suffered by plaintiff, now respondent, Kate S. Gray. The judgment was against defendants Fox West Coast Service Corporation and Harry N. Stone, in the amount of $4,608.40.

The facts are: Defendant Fox West Coast Service Company, being in possession of a building in Butte, Montana, known as Fox Theatre, did lease the same to school district No. 1, Silver Bow county, for the purpose of holding therein commencement exercises on May 29, 1931. Negotiations for the leasing were conducted between defendant Stone, representing his superior officer, one Stegge, general manager of defendant corporation, and one Scott Fries, principal of the high school, acting under authority of the school board.

The time of the use was for the period of the graduation exercises; the rental was $50, which was paid by the school district to the defendant corporation. The conditions of the lease were verbally expressed and were to the effect that the school district should have the complete and full use of the building and equipment, but no stage hands or house employees were included in the lease. The school district was required to make its own arrangements for help. Mr. Fries

hired the stage hands, four in number, with the approval of the school district. This was done by negotiations with one Malloy. The stage hands were paid by the school district; their compensation was $9 each, a total of $36. No employees of defendant corporation were in or around the building during the preparation for, or at the time of, the exercises.

Apparently the theater company had no regularly employed stage hands, but was under the jurisdiction of a local union, International Alliance Theatrical Stage Employees' Union, Local 94. The union furnished stage help, and Mr. Malloy, with whom, as stated, Fries made his arrangements, was the representative of the union. He furnished the men to operate the building and plant on the day of the exercises.

John Curran, a witness for plaintiff, testified that: "The union had jurisdiction over the Fox Theatre * * * . When I say jurisdiction it means that members of our union operate those switches and that was the condition of affairs at the Fox Theatre on the 29th day of May, 1931." This statement was not denied but was somewhat explained, as will be later herein shown.

The complaint contains the allegation: "That persons were entitled to admission who had received tickets from the school district; that plaintiff, being in possession of one of said tickets, entered the building on May 29, 1931, to attend the graduation exercises."

Plaintiff, while stepping from the "east-west aisle" of the theater to an intersecting aisle, fell and suffered her injuries. She testified that the lights were inadequate at that point; that there was no light on the floor; that there was an unlighted step; and that by reason of such step and the lack of adequate light, she fell and so suffered her injuries.

Plaintiff asserts that the step constituted a structural defect in the building. There is nothing in the record to bear out the contention that the construction of the floor and the maintenance of the step constituted faulty construction or created a dangerous condition if properly lighted. Neither is there any evidence to show that the same were out of repair

or in a poor or dangerous condition for that reason. There is evidence that the step was poorly lighted on the day in question. The plaintiff herself testified that she fell and was injured because she did not and could not see the step.

Several witnesses testified that there was an adequate lighting system in the building, including an aisle light at the place where plaintiff fell. The witness Stone testified that: "The system of lights was in working order; * * * when all the lights are turned on, the theater is bright, very bright. When the lights are on, one is able to see any steps in the aisles on the lower floor."

The witness Joseph A. La Forrest testified as follows: "Q. What have you to say as to whether it is light or dark on that particular aisle in the Fox Theatre when all the lights are on? A. With all of the lights on in that Fox Theatre it is plainly lighted so that you can see around. With all the lights on I did not have any trouble at all in seeing any of the steps or any of the aisles in the back of the house." This testimony was given by the witness after an inspection; it is not contradicted.

It then seems clear from the testimony that there were aisle lights in the building and that there was a light at or near the spot where plaintiff fell, but that light was not turned on at the time.

The presence of the step itself, if not out of condition, was no evidence of faulty construction. No evidence was offered to show that the step was inherently dangerous of itself, or that its presence there constituted a structural danger or menace to safety, provided, of course, it was properly lighted. It was not *per se* faulty construction to maintain a step at the point of intersection of the two aisles where plaintiff fell. In the case of *Givens* v. *De Soto Bldg. Co.*, 156 La. 377, 100 South. 534, 535, the court said: "But we need no evidence to satisfy us that it is not *per se* faulty construction to place the seats of an auditorium or theater on a higher level than the aisles between them." (See, also, *Hollenbaek* v. *Clemmer*, 66 Wash. 565, 119 Pac. 1114, 37 L. R. A. (n. s.) 698; *Suggs* v. *Saenger Theatres, Inc.*, 15 La. App. 142, 130 South. 817.)

Apparently, then, the failure to have the step lighted must ▮ have been the fault or negligence of someone. It could only have been the defendant corporation, who was considered the owner of the building, or the lessee, the school district. Plaintiff argues, and cites cases to show, that the school district was not, and could not have been, liable for the tort. The question of the liability of the school district is not before us, and we need not discuss that feature. If, as plaintiff asserts, the school district is not liable, that in itself does not create liability against the defendants in this case, or shift from the school district to the defendants responsibility for plaintiff's injuries.

Plaintiff also argues that the defendant corporation, being ▮ the owner or in possession of the building, is liable upon the same theory that a proprietor of a public place or pleasure resort is liable for the torts of concessionaires, independent contractors or third persons operating under the proprietor. She attempts to bring this case within the rule announced in *Bennetts* v. *Silver Bow Amusement Co.*, 65 Mont. 340, 211 Pac. 336, and cases cited therein. As to the general rule there can be no question. A proprietor does owe to the public the obligation to use ordinary or reasonable care to have the premises safe, as well as to warn the patrons of any hidden or lurking danger on the premises.

This case must turn upon the question: Whose responsibility was it on May 29, 1931, to have the premises in that condition of safety required by law? We have heretofore stated that the injury suffered by plaintiff was not caused by any structural defect in the step over which she fell or an account of the bad order thereof, but was due, as is manifestly shown by the evidence, to the fact that the premises and particularly the step were made dangerous by the failure to use a sufficient amount of light, there being a workable plant in good order and adequate lights properly placed, so that, if they were used, the scene of the accident would have been lighted and the danger of injury thereby obviated. The evidence does show that it was dark at the point of the accident. The wit-

ness Mrs. Chris. Sorenson, in describing the conditions existing there at the time, testified as follows: "It was very dark in there at the time. The experience I had in there at the time was the theater was so dark I went in my seat and sat down on top of another lady; that is, I could not see the seats in there."

Whose responsibility was it, then, on that day to see that sufficient light was turned on and made available? Confusion seems to have arisen by reason of the claim of plaintiff that the school district was helpless in the premises, and that the lights and other paraphernalia were under the jurisdiction of the union. We have already pointed out what was meant by "under the jurisdiction." In the light of all of the evidence it simply meant that no one other than the workmen who belonged to the union could turn the lights on or off or regulate them. It cannot be said from the evidence that the union—through its members, the stage workmen—were in complete control of the lighting system. It is true that they only could operate the system, but there is nothing in the record to show that theirs was the discretion, or theirs the power, to decide what lights should be used or what lights should be turned on. If such had been the case, the theater people, when operating their own business, and the school district, in presenting its program, would have been helpless to decide the manner in which a program could be presented.

We do not need, however, to speculate upon that theory. The witness Curran, a member of the union and a stage hand engaged in the operation of the lights that day, said: "The person from whom we receive our compensation could give orders as to, for instance, turn on more light or less light, and we would be governed by the request of the person who had hired the stage crew." The witness Fries, representing the school district, testified that he hired the stage hands and that the district paid them. He also testified that he was in charge of the exercises and that he gave directions to Mr. Malloy. He said: "We had our commencement exercises from year to year and at the same place, within my knowl-

edge the last seven years. I believe I am correct there. We have the same men who take care of that from year to year. They seem to understand; they know what is wanted.'' He does not testify that he gave any particular direction as to the lights. He does speak of having given directions for chairs, tables and other accommodations. No one testified as to who did decide as to just what lights should be on that day. Nevertheless the fact remains, upon the statement of the witness Curran, that the representatives of the school district could have given directions and were actually in control of the lighting system by reason of that fact.

The stage hands were employed by the school district, were paid by it, and were under the direction of its representatives. There was no one representing, or connected with, the defendants present in the building or assuming to give any directions or to take any responsibility for the operation of the plant. The lease of the school district, while only for a day or a part of a day, was, according to the evidence, absolute and did not in anywise reserve to the defendant corporation, the owner of the building, any rights or authority other than those of landlord.

If, then, the relation of landlord and tenant obtained for that day, and the stage hands—the operators of the lighting system—were the employees of the tenant, the landlord could not be liable for the injuries sustained by plaintiff. The general rule as regards the use of premises by a tenant is found in Ruling Case Law, as follows: ''In the case of injuries to third persons resulting from the condition or use of these premises, it is a general rule that prima facie the breach of duty, and therefore the liability, is that of the occupant and not of the landlord, and that in order to render the latter liable more must be shown than merely that the premises on which or from which the injury arose were leased by him to another.'' (16 R. C. L. 1063.) This principle is borne out by the cases of *Farmer* v. *Modern Motors Co.*, 235 Ky. 483, 31 S. W. (2d) 716; *McCain* v. *Majestic Bldg. Co.*, 120 La. 306, 45 South. 258; *Kalis* v. *Shattuck*, 69 Cal. 593, 11 Pac. 346,

58 Am. Rep. 568. In the last case cited it was held that the landlord is not liable for the use which the tenant makes of the premises, unless the nuisance occasioning the injury existed at the time the premises were demised, or the structure was in such a condition that it would be likely to become a nuisance in the ordinary and reasonable use of the same for the purpose for which it was constructed and let, and the landlord failed to repair it, or the landlord authorized or permitted the act which caused it to become a nuisance occasioning the injury.

The courts have been unanimous in holding that a landlord "is not liable for an injury occasioned [to] a third person by the neglect of a tenant properly to use or keep in place a guard, in good condition, provided by the landlord upon the premises when demised." (47 A. L. R. 846, and numerous cases cited in support thereof. See, also, *Caldwell* v. *Slade,* 156 Mass. 84, 30 N. E. 87.)

In 26 R. C. L. 716, under the title of "Theatres and Shows," this pertinent statement occurs: "Where, however, possession has passed to the lessee, the lessor does not owe the public the duty of keeping the premises in safe condition or providing against the negligent acts of the lessee which render them unsafe." A case in point, and particularly pertinent by reason of the fact that it is a case growing out of the use of a building for commencement exercises by a graduating class, is that of *Shellman* v. *Hershey,* 31 Cal. App. 654, 161 Pac. 132, 137. In that case the owner of a building leased it to a graduating class for their commencement exercises. The building was an opera house. On the evening of the entertainment one of the persons attending opened a door and fell several feet into the street. The door was not used by the theater company as either an entrance or an exit, and it was not necessary in handling the crowds that the door be so used. The court, in finding no liability of the defendant owner, said: "Further reference to authorities seems unnecessary. We think it results from the principles above stated that the only question here is: Was this side door to the

theater a nuisance when the premises were leased to defendants Henry and Giesea, or did it become such for the time being when the tenants used it for a purpose other than that for which it was designed and had, from the day the house was built, been used to the moment the present tenant misused it? We think the premises were not a nuisance when demised and became so because of the manner in which the tenants used them on the night of the accident.''

In this case it is clear that the theater company not only had nothing to do with the operation of the plant or the adjustment or regulation of the lights, but had nothing to do with the invitations extended to the public or a part of the public. People entered the theater at the invitation of the school district only and to witness a program not of the character ordinarily given to the public in the building. In all of the cases relied upon by plaintiff to fix the liability upon the defendants, there entered some element other than the mere relation of landlord and tenant.

In the case of *Tulsa Entertainment Co.* v. *Greenlees*, 85 Okl. 113, 205 Pac. 179, 181, 22 A. L. R. 602, cited by plaintiff, two elements of difference existed. The cause of action arose out of the collapse of a part of a grandstand. The court said: ''The evidence is undisputed that many of the posts and supports in the bleachers were badly decayed; that the Tulsa Entertainment Company was notified of this fact, but refused to make any repairs because it was not receiving any monetary compensation for the use of the ball park on this occasion.'' The court further called attention to the fact that the ball park and the grandstand therein were maintained for the accommodation of the public invited to attend and witness athletic events, and that the invitation proper continued until withdrawn and until the public knew it had been withdrawn, and that the event in progress at the time of the accident was a ball game, the very type of entertainment ordinarily furnished at that particular park.

Some question was raised as to just who had control of the theater. The Fox West Coast Service Corporation, one

of the defendants herein, asserted that the possession was in an associate corporation known as Silver Bow Amusement Company, which latter corporation, it was claimed, had leased from the owner. This matter is not important in light of the holding of this court as to nonliability of the defendant Fox West Coast Service Corporation. The same may be said as to the defendant Henry L. Stone. Stone was not in control or possession of the premises himself as an individual, but whatever connection he had with the transaction was that of an employee of the defendant corporation or its associate corporation. Stone was not present at the time of the accident or at any time during the preparation for or progress of the program. No personal liability can attach to him.

The judgment is reversed and the cause remanded to the district court of Silver Bow county, with direction to dismiss the complaint.

Mr. Chief Justice Callaway and Associate Justices Angstman, Matthews and Anderson concur.

Rehearing denied February 17, 1933.