LOEW'S NASHVILLE & KNOXVILLE CORPORATION v. DURRETT (two cases).—79 S. W. (2d) 598.

Middle Section. November 16, 1934.

Petition for Certiorari denied by Supreme Court, February 23, 1935.

490

Trabue, Hume & Armistead, of Nashville, for plaintiff in error.
Stokes & Stokes, of Nashville, for defendants in error.

FAW, P. J.  The above styled two cases were tried together, by consent, in the circuit court of Davidson county.

In one of the cases Margaret Durrett sued Loew's Nashville & Knoxville Corporation to recover damages for personal injuries suffered by her in a moving picture house operated by defendant in the city of Nashville.

In the other of the two cases, A. B. Durrett, the husband of said Margaret Durrett, sued the same defendant for the loss of his wife's services, and for expenses incurred by reason of her injuries as aforesaid.

In this court Lowe's Nashville & Knoxville Corporation is plaintiff in error, but, for convenience, in this opinion Margaret Durrett and A. B. Durrett will be designated plaintiffs and Loew's Nashville &

Knoxville Corporation as defendant, according to the attitude of the parties on the record below.

The case was tried to a jury twice in the circuit court. On the first trial the jury failed to agree and a mistrial was entered. On the second trial the jury found the issues in favor of the plaintiffs and assessed the damages of A. B. Durrett at $1,000, and the damages of Margaret Durrett at $2,000. The trial court overruled a motion for a new trial on behalf of defendant, and rendered a judgment in favor of each of the plaintiffs in accordance with the verdict of the jury, whereupon the defendant appealed in error to this court, and (having preserved the evidence heard and the proceedings had on the first trial by a wayside bill of exceptions) is here complaining, through assignments of error, of certain specified rulings of the trial court at each of the trials below.

It is proper that we first dispose of the assignments of error directed to the rulings at the first trial. Oliver Mfg. Co. v. Slimp, 139 Tenn., 297, 202 S. W., 60.

A motion for a directed verdict on behalf of the defendant was made and overruled at the close of the plaintiffs' proof in chief, and was renewed, and again overruled, at the close of all the evidence. After the discharge of the jury and the entry of a mistrial, the defendant moved the court to set aside the order of mistrial and to render a verdict in its favor on a number of grounds set out in the motion, which included all the grounds on which assignments of error are predicated in this court.

The defendant's first assignment of error is that, ''The Court erred in not sustaining the defendant's motion to instruct the jury to bring in a verdict in its behalf, made at the conclusion of all the evidence in this case, on the ground that there was no evidence upon which a verdict against this defendant could be based.''

Through its remaining assignments of error (numbered 2, 3, 4, 5, and 6), the defendant complains of the action of the trial court in admitting certain quoted testimony of witnesses for plaintiffs, over objections of the defendant.

The fact that defendant is assigning error upon the action of the trial court in overruling its motion for a directed verdict, and also asserting, through other assignments of error, that the trial court admitted incompetent evidence over defendant's objection, suggests the inquiry as to whether this court should (as the trial court presumably did when passing upon the motion for a directed verdict at the close of all the evidence) take into consideration all of the evidence favorable to the plaintiffs which was admitted below, or should first dispose of the assignments directed to the admission of evidence and, if they are found well made, disregard such incompetent evidence in disposing of the motion for a directed verdict.

In California, with constitutional provisions precisely similar to

our own, the practice of directing a verdict obtains under the name of a "compulsory nonsuit." See Hopkins v. Railroad, 96 Tenn., 409, 436, 34 S. W., 1029, 32 L. R. A., 354.

A number of California cases are cited in 64 C. J., page 400, section 398, for support of the statement in the text that, on motion for nonsuit, "all the relevant evidence received must be given the effect of its full probative force, regardless of whether it has been erroneously admitted," and, on examination, these cases are found to fully support the text.

In Battis v. McCord, 70 Iowa, 46, 48, 30 N. W., 11, 12, it was held that "when the defendant elected to stand on the motion (for a directed verdict), the errors, if any there were, that previously occurred, were waived."

But our Supreme Court has held to the contrary. The question was directly presented in King v. Cox, 126 Tenn., 553, 560, 151 S. W., 58, 60, "as to whether a motion for peremptory instructions is a waiver of the right to assign errors in the appellate court on the ruling of the trial judge on points of evidence," and was there ruled in the negative. Pages 565-569 of 126 Tenn., 151 S. W., 61. However, in our view (as hereinafter stated) of the question made by defendant's first assignment of error in the instant case, the evidence challenged as incompetent by defendant's remaining assignments of error is not controlling in the disposition of the motion for a directed verdict. Hence, we may proceed to dispose of the assignments of error in the order of their assignment.

In the consideration of a motion for a directed verdict on behalf of the defendant, the inquiry is, whether there is any material evidence which, together with all reasonable inferences favorable to the plaintiff which may be drawn therefrom, reasonably tends to support the cause of action stated in the plaintiff's declaration.

The declaration of plaintiff Margaret Durrett contains two counts. In the first count she sues the defendant for $25,000 as damages, and, for cause of action, avers that the defendant is a Tennessee corporation and engaged in the theater or moving picture business, and, as such, operates a house in Nashville, Tennessee, at 615 Church street in said city; that, in the operation of said business, defendant presents moving pictures to which the public are admitted upon the payment of the price of a ticket, and in further operation of said business presents pretty well an all day entertainment, operating said theater in daytime as well as night, to all of which entertainments the public is invited to come and enter said building upon the payment of the regular price for a ticket.

Plaintiff further avers that on or about September 27, 1930, she went to defendant's place of business to attend a matinee or afternoon performance; that on going there she found the theater open, ready for the admission of the public; that the servant, agent, and

employee of the defendant was at the time engaged in selling tickets for admission to said performance and people were buying tickets and entering said building where said performance was being had; that plaintiff applied to said ticket agent and purchased from him a ticket for the afternoon performance and was told to go up the steps to the balcony—which she did; that the balcony of said theater wherein said performance was to be had has an open passway across the building; and that steps or passways intersect this passway at various places, some ascending to seats in the rear and others descending towards the stage, where there are seats considered by the public, and are, in reality, more desirable than those to the rear of the balcony.

The above-stated averments of the declaration are proven and are not disputed.

Omitting the averments with respect to the nature and extent of plaintiff's injuries, the remaining averments of the first count of her declaration are that, "on reaching the balcony plaintiff found the theater or building very poorly and dimly lighted; that there was no usher or other servant, agent or employee of the defendant to assist the plaintiff in finding a seat and that plaintiff then undertook to go down a stairway leading from the passageway aforesaid towards the stage of the theater, and in doing so she had to feel her way on account of the darkness of the theater, and when she had gone a certain distance down the steps and not knowing whether she was at the bottom of the steps, and which she could not definitely determine because of the darkness of the theater, she took another step, in consequence of which, together with the darkness of the theater, she, without fault on her part, fell and seriously and permanently injured herself. . . . And plaintiff avers that it was not only negligence in the defendant in receiving guests in the darkened condition of the theater, but also in failing to have ushers in the building at the time to receive the guests and show them to their seats, and that on account of said negligence plaintiff was seriously and permanently injured as aforesaid."

The second count of Margaret Durrett's declaration contains the same averments as the first count, and, in addition, it is averred therein that "the defendant in the operation of its theater aforesaid was at the time of plaintiff's injury aforesaid, violating the laws of the city of Nashville, and said violation caused or contributed to plaintiff's injuries aforesaid;" and plaintiff sets out four ordinances, or building laws, of the city of Nashville which, she avers, were thus violated, viz.:

(a) Section 476, vol. 1, page 257, of Ewing & Garard's laws of Nashville, which provides that "where steps are placed in passages, they shall be grouped together and shall be clearly lighted."

(b) Section 487, page 259, of the same code of ordinances, which

provides that "all stairways shall have on both sides strong hand rails."

(c) Section 516, page 269, of the same code of ordinances, which provides that "the stage section and every portion of the building devoted to the uses or accommodation of the public, also all passages leading to streets, including the open courts and corridors, shall be satisfactorily lighted during every performance, and until the entire audience has left the premises."

(d) Section 461, page 253, of the same code of ordinances, which provides that "every theater or opera house or other building or parts of building designed or used for theatrical purposes, or motion picture shows shall be built to comply with the requirements of this code."

The foregoing declaration of Margaret Durrett was filed on March 15, 1932, and on June 17, 1932, she was permitted to amend her declaration by inserting therein averments as follows:

"Plaintiff further avers that the steps in said stairway were negligently constructed and that the defendant in operating a theater with such stair steps was guilty of negligence. That said steps were irregular and of different sizes and dimensions, and that people in trying to use them had repeatedly fallen while descending said steps, that in their construction to be used in a darkened or dimly lighted theater were traps endangering the life and limbs of any persons so attempting to use the same, and many persons had fallen in so attempting to use said steps both before and after plaintiff fell and was injured in attempting to use them. And that said steps were not constructed in accordance with the laws governing the construction of building as passed by the City Council of Nashville, Tennessee, Sec. 476, Ewing & Garard's Compilation of Laws of Nashville."

The declaration of A. B. Durrett likewise contains two counts which, for all the purposes of the motion for peremptory instructions, are identical with the declaration of Margaret Durrett. The defendant pleaded the general issue—not guilty—to both declarations.

It appears from the testimony of the plaintiff Mrs. Durrett that she was fifty-four years of age and in the normal possession of all her faculties at the time she suffered the injuries for which she is suing in this case, and that she had lived all of her life in Nashville.

The proof shows, and it is undisputed, that Mrs. Durrett fell while descending the steps in an aisle of the balcony in defendant's motion picture house or theater. The aisle was three feet wide and there were eight steps. Plaintiffs' witness George Moore stated that there were ten of these steps, but two photographs in the record show that there were only eight steps, and, as the accuracy of these photographs is not questioned, we assume that it will be conceded that Mr. Moore's statement that there were ten steps in the aisle was an inadvertent error.

The "risers" of the steps were of a uniform height of seven inches, but the "treads" alternated regularly between a tread ten inches wide and one twenty inches wide. This was for the reason that the rows of chairs were on platforms twenty inches wide and each platform fourteen inches below the platform immediately above it.

Aside from the manner of their original construction and the charge that they were insufficiently lighted there is no claim in the pleadings or the proof that there was any defect in the steps, or in the carpet with which they were covered.

On her examination in chief, the testimony of plaintiff Mrs. Durrett with respect to the manner in which she fell is as follows:

"Q. Now, which flight of steps did you go up, the one on the left or the one on the right of the theater? A. On the right.

"Q. When you got upstairs I will get you to state something about the construction of it, whether there is a passageway and seats going up back of the theater and seats down below this passageway? A. Yes.

"Q. Just tell how it is. A. When you get to the head of the stairs there is a passage in there, and back of this passage are seats grouped, and in front of it.

"Q. Were any ushers up there to show you your seat? A. No.

"Q. Which aisle did you start down, or up, whichever way you went? A. I went down the second aisle.

"Q. The second aisle. Now, do you count the aisle up next to the wall as one aisle? A. That is the first aisle, yes.

"Q. And then you went— A. Down, yes.

"Q. Did you fall as you went down there? A. Yes.

"Q. Now, I will get you to state whether or not that aisle was lighted or was it dark? A. It was dark.

"Q. In going down there, just tell the jury how you were going. And you can just stand up and show them, if you want to, how you started down. A. Well, as I felt my way at the back of this group of seats there to the second aisle, and when I got there I found I couldn't see, and I just started down, pushing one foot out in front of the other, just feeling the steps, you know, and as I thought I had taken three or four steps I then plunged over, I fell, I just plunged over the arm of the chair—shall I tell it that way?—like that was the arm of the chair.

"Q. What part of your body hit the arm of the chair? A. Well, when I fell I struck myself right across my breast here, and wrenched my back, and this hand just plunged into the floor, and it was with difficulty that I pulled myself up.

"Q. Now, you say it was dark on that aisle. Were there any lights burning in the aisle? A. No.

"Q. On the steps? A. No.

"Q. Or underneath the chairs? A. No.

"Q. Now, you fell on your left side? A. My right side.

"Q. On your right side and your right breast struck the arm of the chair. Did it strike the back or the arm? A. The arm; struck the iron arm of the chair.

"Q. Now, did any one come to you then, or soon after that? A. No, I got up, just pulled myself up the best I could, to the top of the steps, and when I got to the top of the steps the usher came hurriedly across from the other side of the house."

On cross-examination, Mrs. Durrett testified further as to the circumstances attending her fall in the aisle as follows:

"Q. Now, Mrs. Durrett, you had been in Loew's Theater any number of times before this accident happened, hadn't you? A. Well, some times.

"Q. And you had been in the balcony many times before that? A. No, that was the first time.

"Q. Why did you go up there that day? A. Because it was cheaper up there.

"Q. Aren't the seats in the balcony the same price as the seats in the orchestra? A. The same price?

"Q. Yes, ma'am? A. I don't think so.

"Q. Well, you had been to moving picture shows here in Nashbille several times—quite often—before this accident, hadn't you? A. Yes.

"Q. And you had been going in there, in Loew's Theater? A. Yes.

"Q. Now, this reporter, as his Honor told you a while ago, he can't put down a nod; you will have to speak out, yes or no? A. Yes.

"Mr. Stokes: Speak out, please, so the stenographer can catch it. A. Yes.

"Mr. Armistead: Q. Now, this was, of course, broad open daylight when you went in this Loew's Theater? A. Yes.

"Q. And you had on about the same style shoes you have on now? A. No, I had on a walking shoe, a Matrix Walking Shoe.

"Q. What kind are those you have on now? A. This is a Matrix, but it is not a walking shoe; it is a—

"Q. Were those shoes about the same size as those you have on now? A. No, they are a different shaped heel to a walking shoe.

"Q. About the same height? A. They may be.

"Q. Your best recollection is they are about the same height? A. Well, I guess so, yes.

"Q. Will you allow me, please, to measure the heel on your shoe? A. Yes.

"Q. (Measuring shoe heel) That is just a fraction over two inches? You will have to speak out. A. Yes.

"Q. Now, Mrs. Durrett, you go in and buy your ticket, out there at Loew's Theater, at the ticket box, which is right there practically on the edge of Church street? A. Yes.

"Q. And then there is a pretty wide hall? A. Yes.

"Q. That the patrons use in going into the theater? A. Yes.

"Q. And when you get back there, just before you get to the inside entrance to this theater, practically at the end of the hallway, there is a boy who stands there at a box taking up the tickets, isn't there? A. Yes.

"Q. Now, I am going to assume for a moment that I am that man taking up these tickets; I am over on the right hand side, that is, the left hand side of the patrons coming in, is the usual place for people to go when they want to sit downstairs? A. Yes.

"Q. Now, if you want to go upstairs, this boy there signals for them—the boy shows them the aisle leading upstairs? A. Yes.

"Q. That is, to the balcony; in other words, a person coming in from that entrance, when he gets down here to where this boy stands, he is going to turn to the right? A. Yes.

"Q. To go on up the stairway leading to the balcony? A. Yes.

"Q. And that is the course that you followed? A. Yes.

"Q. Now, you go right on up this stairway; you don't have any trouble getting up that at all? A. No.

"Q. And when you get up to the top there is a balcony, isn't it? A. Yes.

"Q. And there is the landing right there? A. Yes.

"Q. Now, right over on your right there is an aisle that leads down to some seats, isn't there? A. Yes.

"Q. Of course, there is a passageway leading all the way across the theater? A. Yes.

"Q. I can come in here on this side of the theater, and if I take a notion I want a seat over there on my left hand side, I can walk plumb over there and go down the same sort of aisle next to the wall over on the other side, can't I? A. Yes.

"Q. Now then, there are also a number of other aisles leading down to seats, we will say, east of this west aisle in that balcony, that is right, isn't it? A. Yes.

"Q. All right. You got up there on that floor, the second floor, there in the balcony, and there were some seats up there—it is kind of designated as the 'roost'? A. Yes.

"Q. Those seats are cheaper than these other seats? A. I don't know.

"Q. Anyhow, they are not as popular as these other seats down here? A. No.

"Q. So you decided that you would go and take one of these seats, which was closer to the stage? A. Yes.

"Q. Now, did you walk down this first aisle immediately east of the west aisle of the theater? A. Well, if you say east of the west I don't know, but the right or left?

"Q. Now, on your right side Mrs. Durrett, that west aisle over

there, that is the west aisle over there, that is the west aisle, that is the one almost in front of this big stairway you came up? A. Yes.

"Q. Now, over on this side there are some other aisles there, east, of course, of this west aisle? A. Yes.

"Q. Now, was it this first one you went down? A. Yes.

"Q. All right, We will call that No. 2 aisle No. 2, on this diagram that I have drawn here on the board—I will agree with you, I don't know how to draw a map. Now, Mrs. Durrett, you didn't have any trouble walking from this place here over to this aisle here, did you? A. Yes.

"Q. You did? A. Yes, I felt the back of the seats; I had to feel my way, just feeling along, until I came to the last seat to that aisle.

"Q. I see; you got up in there, and you wanted to come over here to this second aisle, but it was so dark up there you couldn't see how to get about; that is correct, isn't it? A. Yes.

"Q. Of course, you were not looking at the picture at all, were you? A. No indeed.

"Q. You were looking right in front of you, but you come to this last aisle and you feel to where you come to the end of the seats, don't you? A. Yes.

"Q. Then you turned and started down these steps, didn't you? A. Yes.

"Q. And it is still so dark you can't see? A. Yes.

"Q. And you go down those steps, put one foot down and— Did you hold onto the sides of the seats? A. No.

"Q. Didn't hold onto anything at all? A. No.

"Q. All right. You put another foot forward, and you come down three of those steps, is that right? A. Three or four.

"Q. Three or four of them; well, you didn't have any trouble feeling that fourth step, did you? A. I don't know.

"Q. Well, did you have any trouble feeling the third step? A. I think when I reached that I fell.

"Q. Well, you didn't have any trouble feeling the first step, you know that, that is right, isn't it? A. No, I just felt each step.

"Q. You were going awfully careful and slow? A. Yes.

"Q. You didn't have any trouble feeling the second step, is that right? A. Yes.

"Q. Never looked at the picture? A. Never glanced at the picture.

"Q. The picture was going on at the time? A. Yes, but I never look at the picture until I am seated.

"Q. Ma'am? A. I say, I never look at the picture until I am seated.

"Q. And you didn't look at it this time; you were looking down at your feet, weren't you? A. Yes.

"Q. And you didn't have any trouble feeling the surface, did you? A. I would go to the edge and feel the edge and step down.

"Q. Why did you fall then? Did you feel that step that you stumbled on? A. It must have been I thought I was on the landing steps, because it was dark and I couldn't see, I couldn't judge I was on the landing, and it was the last step and I fell; that is all I can tell you.

"Q. Let me ask you, Mrs. Durrett, if you thought you were on the last step, at least on the landing, why was it you put your other foot forward to go down some more? A. Well, I don't know that I put my other foot forward when I fell, I just started, I guess, I just went over; that is all I can tell; I just fell.

"Q. Well, you say you thought you had gotten down to the bottom of the landing, don't you? A. Well, I wasn't familiar with that—

"Q. I know, I understand, but didn't you say a while ago you thought you had gotten down to the bottom of the landing? A. I had taken three or four steps—

"Q. Didn't you say a while ago, Mrs. Durrett, that you thought you had gotten down to the landing? A. Well, the steps were so irregular, I supposed that—

"Q. You thought you were on the landing? A. I tell you I didn't think anything; I simply fell; that is all there is to it.

"Q. Now, Mrs. Durrett, let me and you see if we can understand each other. Didn't you say a while ago that you thought you had reached the landing? A. I may have said that.

"Q. Ma'am? A. I may have said that.

"Q. Well, you are usually meaning what you are testifying to here, aren't you? A. Yes.

"Q. So you thought you had reached that landing? A. Well, it was dark, and I can't say anything only that I just fell.

"Q. But you thought you had reached the landing, that is right, isn't it; you say that, don't you? A. Well, I don't know, I may have thought it at the time that I had reached the landing, I don't know, I couldn't be positive.

"Q. Well, didn't you state just a moment ago, please, ma'am, that you thought you had reached the landing? A. I said this morning that I had turned three or four steps.

"Q. And thought you had reached the landing? A. Perhaps I said that.

"Q. All right. A. And maybe I did think that.

"Q. All right. Then, why was it that you stepped down again after you thought you had reached the landing? A. Well, I don't know that I stepped down again.

"Q. Well, while you had both feet or one foot on this step, you certainly had both feet on that step after you thought you had

reached the landing, didn't you? A. Well, when the fall happened I was feeling with my feet and just went over, that is all I can tell you, just went over.

"Q. So, then, you did have one foot on the step then, didn't you? A. I suppose so.

"Q. And you were feeling with the other foot? A. Yes.

"Q. Well, couldn't you feel the end of the steps? A. No.

"Q. You couldn't? A. I didn't, I just—I will tell you, the fall came and that is all I could tell you about; I just—

"Q. I am trying to find out, though, what you were doing when you fell, Mrs. Durrett. Now, you said that you thought you had reached the landing; now you say that you had one foot out feeling around and you couldn't feel the end of the steps; that is what you say, isn't it? A. Yes.

"Q. Ma'am? A. Yes, I said that.

"Q. Now then, I am asking you why you were feeling down around with either foot, if you thought you had reached the landing; why didn't you take a seat? A. I didn't have time to take a seat.

"Q. You mean while standing up there you just fell over? A. No, I was trying to find my way.

"Q. Now, you found your way to the landing; that is where you were going to stop, wasn't it? A. As I say, I wasn't familiar with that up there and I didn't know anything about it and I was just feeling my way down the dark steps.

"Q. Well, wasn't there any seats between you—that is, were there no seats vacant that you could have sat down in before you fell? A. I suppose I could have sat in the first seat, but I usually try to get close to see a picture.

"Q. Ma'am? A. I usually get close to see a picture.

"Q. So then you did know that there were some seats further up which were better seats? A. Better seats?

"Q. Yes, ma'am? A. Further up, you mean?

"Q. Closer to the screen? A. Well, yes, I suppose any seat closer up is better to see.

"Q. You did know, then, there were some seats closer up to that screen? A. Yes, I suppose there were.

"Q. And you were going to find one of those seats? A. Yes.

"Q. And you didn't know how many steps were up there? A. No.

"Q. Now, you were walking down the center of that aisle? A. Yes.

"Q. You could have felt the seats with your right hand or with your left hand, couldn't you? A. I don't know, from the center, whether I could or not.

"Q. Well, why did you walk down the center? A. I always walk down the center of an aisle in a theater.

"Q. Well, if it was so dark over there that you couldn't see

where you were going, why is it that you know that you were walking down the center of that aisle? A. I could see the wide space, I could see the aisle there; anybody could tell there was a space there; you could see that there was a space.

"Q. That there was a space? A. Yes. But at the same time it was so dark below me there I couldn't see every step I was taking; if I had, I wouldn't have looked like I did and felt like I did and gotten the fall.

"Q. So, then, Mrs. Durrett, if I understand you, you tell the court and jury that it was so dark up there that you couldn't see where you were going but nevertheless you were on your way; now, is that what you said? A. Yes.

"Q. Was there anything wrong with your eyesight when this accident happened? A. Well, I wear glasses.

"Q. Ma'am? A. I wear glasses.

"Q. Did you have them on when this accident happened? A. No, I did not.

"Q. Other people were coming in the theater? A. Some went in ahead of me.

"Q. They walked on down there? A. With the usher.

"Q. Ma'am? A. With the usher.

"Q. Why didn't you wait for the usher to come to you? A. Why, he went clear across the house with them, I suppose.

"Q. You mean there was enough light up there for you to see this usher going plumb across the side of that house with those people who were immediately in front of you? A. I just know they didn't go down the aisle I went down.

"Q. You do know, though, that you saw the usher putting them in seats? A. No, I didn't see him do that; I suppose he did that.

"Q. When did you see him after this accident? A. When he came up after I had fallen and had crawled up the steps."

Later, Mrs. Durrett was recalled and introduced in evidence the shoes she was wearing at the time of her injury, and proved that· they were her "regular walking shoes," and that "the heels were an inch and a quarter in height."

· It is seen that Mrs. Durrett was not able to state the immediate cause of her fall. The sum of her testimony on that point is that she attempted to descend the steps while it was so dark she could not see the steps, and that while she was feeling her way down the dark steps and had gone down three or four steps, she "simply fell" and "that is all there is to it."

As said by the court in Peck v. Yale Amusement Co. (Mo. Sup.), 195 S. W., 1033, 1034, plaintiff's "explanation is so meager that no court could say just what did cause her fall."

It would be a mere matter of conjecture to say that the irregularity in the width of the treads of the steps caused Mrs. Durrett

to fall; and a verdict cannot be based on a conjecture. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389-396, 242 S. W., 646.

The trial judge was of the opinion that the ordinances or "Building Laws" of the city of Nashville, on which the second count of the declaration is predicated, have no application to defendant's moving picture theater, and he did not submit the case to the jury on the second count; but in his charge, with respect to alleged negligence of the defendant, limited the case to "the matter of having insufficient lights down that aisleway and in the matter of the dangerous and ununiform condition of defendant's steps leading down the aisle, and in the matter of not having a sufficient number of ushers to assist her in gaining her seat in safety."

We concur in the view of the trial judge that said city ordinances have no application to the facts of this case. The code of "Building Laws of the City of Nashville" is in evidence, and it appears that all of the provisions thereof upon which the plaintiffs predicate the second count of their respective declarations are found in "Part XXXV" which is entitled "Construction and Equipment of Theaters;" but "Part XXXVI" of said code, entitled "Construction of Moving Picture Theaters," covering about three pages of the code, contains detailed provisions for the construction and equipment of moving picture theaters, to which class defendant's house obviously belongs.

As before stated, we are of the opinion that there is no evidence upon which a jury could predicate a finding that the irregularity in the width of the tread of the steps was the proximate cause of Mrs. Durrett's fall, so that the only averments of negligence on the part of defendant that are supported by evidence are: (1) That defendant's theater or building was "very poorly and dimly lighted," and (2) "there was no usher or other servant, agent or employee of the defendant to assist the plaintiff in finding a seat."

The proprietor of a moving picture theater or other place of public amusement, to which the public is invited and admission charged, is under an obligation to use ordinary care and diligence to put and keep the place in a reasonably safe condition for its patrons. Such proprietor is not an insurer of the safety of persons attending, but he is bound to use ordinary care for their safety and protection, and if an injury results to them from a breach of this duty he is liable. New Theatre Co. v. Hartlove, 123 Md., 78, 82, 90 Atl., 990; Glynn v. Lyceum Co., 87 Conn., 237, 241, 87 Atl., 796. The rule just stated is well-nigh universal in America. See the following annotations: 22 A. L. R., 611, 670, 671; 29 A. L. R., 29, 33; 38 A. L. R., 357; 44 A. L. R., 203; 53 A. L. R., 855; 61 A. L. R., 1289.

But the duty which the proprietor of a moving picture theater owes to its patrons does not relieve a patron from the duty of

exercising ordinary care for his own safety. Pattison v. Livingston Amusement Co., 156 App. Div., 368, 141 N. Y. Supp., 588, 589.

"Moving pictures are, and of necessity must be, shown in semi-darkness." Givens v. De Soto Building Co., 156 La., 377, 378, 100 So., 534, 535; Espel v. Amusement Co., 20 Ohio App., 470, 473, 152 N. E., 684.

Assuming that, in the instant case, it was for the jury to say whether or not the defendant was guilty of actionable negligence in not lighting its aisleway as ordinarily prudent persons operating such a theater would light it (Espel v. Amusement Co., supra, page 472 of 20 Ohio App., 152 N. E., 684), and in not furnishing a sufficient number of ushers to attend patrons, it remains to be determined whether plaintiff Mrs. Durrett did not voluntarily assume the risk of a known danger and was, therefore, as a matter of law, guilty of contributory negligence which bars her action (Knoxville Traction Co. v. Brown, 115 Tenn., 323, 331, 332, 89 S. W., 319).

The attention of plaintiff Mrs. Durrett was forcibly drawn to the absence of an usher to attend her, and also to the darkness of the aisle, and she knew and appreciated the fact that there was danger that she would fall if she attempted to descend the steps in the darkness. She was not a child, or a mentally infirm person, but an intelligent woman of mature years, accustomed to visiting moving picture shows. An invitee may rely upon the safety of the premises, if he is not aware of the danger (Rosenbaum v. Shoffner, 98 Tenn., 624, 633, 40 S. W., 1086), or there is no reason to apprehend danger (Ellis v. Cotton Oil Co., 3 Tenn. Civ. App. [3 Higgins], 642).

In the case of Bouchard & Sons Co. v. Keaton, 9 Tenn. App., 467, the plaintiff sued for damages on account of injuries to his person caused by being hit by a piece of steel dropped by men working on a bridge. The evidence showed that plaintiff went to work under the bridge knowing that things might be dropped by the workmen above. It was held that he assumed the risk of the position and could not recover.

In the opinion in the case just cited, this court said:

"In strictness, the technical doctrine of 'assumption of risk' applies perhaps only to the contractual relation of master and servant, but one frequently finds in opinions of the courts the expression 'assumption of risk' as the practical equivalent of the term 'contributory negligence.' 20 R. C. L., p. 109, sec. 95.

"In 45 Corpus Juris, p. 944, sec. 503, it is said:

" 'While, under certain circumstances, the same acts or conduct may render one guilty of contributory negligence or give rise to the defense of assumption of risk, "assumed risk" and contributory negligence" are distinct doctrines of law, and are not synonymous. The doctrines are distinguished from each other elsewhere in this work.

In common parlance, however, the reckless disregard of a danger is often spoken of as an assumption of risk by the party exposing himself thereto, although it is not the ordinary assumption of risk arising out of contract relations.'

"And it has long been the law, based on the ancient maxim, volenti non fit injuria, that one who voluntarily places himself in a position of peril, knowing and appreciating the danger, assumes the risk thereof. Broom's Legal Maxims (8 Ed.), p. 267 et seq., . . .

"In Standard Oil Co. v. Titus, 187 Ky., 560, 563, 219 S. W.. 1077, the court said:

" 'In view of the fact that the doctrine of assumed risk is not based entirely on contract, but grows out of the application of the maxim, "Volenti non fit injuria," it is well settled that independently of the relation of master and servant, there may be a voluntary assumption of the risk of a known danger which will debar one from recovering compensation in case of injury, even though he was in the exercise of due care.'

"The statement of the law last quoted was approved and applied in the case of McLeod Store v. Vinson, 213 Ky., 667, 281 S. W., 799, 800. And the same principle was announced and applied in the case of McLean v. Studebaker Bros. Co., 221 N. Y., 475, 117 N. E., 951, 1 A. L. R., 1551, 1553.

"The same doctrine (described as assumed risk) has been applied in this State to a case wherein the relation of master and servant did not exist between the plaintiff and defendant. An Ice Company contracted with the Terminal Company to ice refrigerator cars on the premises of the Terminal Company. Baker, an .employee of the Ice Company, while engaged in icing a car in the performance of his employer's contract with the Terminal Company, fell from the top of a car and was injured. In the course of its opinion disposing of Baker's action for personal injuries against the Terminal Company, the Supreme Court said:

" 'The other allegation is that plaintiff did not know of the snow and ice being on said car, which defendants had negligently allowed to be there, and failed to warn plaintiff against the danger. This was a danger that was open and obvious to plaintiff the moment he climbed upon the car, and having assumed the risk of icing the car under such conditions, he cannot be heard now to complain.' Baker v. Railroad, 106 Tenn., 490, 500, 61 S. W., 1029 [53 L. R. A., 474].

"The case of Baker v. Railroad, supra, is one of the cases cited in 44 A. L. R., at pages 1124, 1125, as supporting the statement of the Annotator that 'by most of the American courts which have had occasion to express their views upon the subject, the remedial rights of a contractor's servant have uniformly been determined upon the theory that his assumption of a risk becomes a conclusion in point

of law, whenever it appears that the injured person was chargeable with knowledge, actual or constructive, of that risk.'

"The undisputed evidence in the case at bar shows that the plaintiff knew and appreciated the precise nature of the danger and peril in which he was placing himself when he set to work to dig a hole beneath the riveters on the pier."

The New York case of Pattison v. Livingston Amusement Co., supra, is practically on "all fours" with the instant case. In that case the court said:

"Plaintiff has failed to show herself to be free from negligence contributing to her injury. She testified that, when she entered upon the platform at the rear of the balcony in defendant's theater, it was 'dark' 'very dark,' so dark that she could not see any steps. The seats which she had purchased were in the fifth row from the front. There was a sharp conflict of evidence upon the question of the absence of light; but, as she has persuaded the jury to accept her testimony as true, she in turn must accept ·the consequences thereof. She had been in the theater before, and she knew that there were steps leading down from the platform to the said fifth row of seats. Notwithstanding this knowledge, and notwithstanding this darkness, to use her own words, she groped her way along. She neither asked for assistance to find her way, nor waited, as there was abundant time for her to do, until more lights had been turned on. Missing her footing at the top of the steps, she fell and was injured. Within the authorities she was guilty of contributory negligence as matter of law, and the motion for a nonsuit should have been granted."

And so, we think that, according to the undisputed testimony of the plaintiff Mrs. Durrett, she assumed the risk of a known danger and was, as a matter of law, guilty of contributory negligence which proximately contributed to her injuries, and that the trial court should have sustained the defendant's motion for a directed verdict at the first trial.

It results that the defendant's first assignment of error is sustained.

It also follows that the remaining assignments of error become immaterial and their consideration is pretermitted. The verdicts of the jury on the second trial are set aside, the judgments are reversed, and the plaintiffs' suits are dismissed, and judgment will be entered accordingly.

The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiffs, Margaret Durrett and A. B. Durrett.

Crownover and DeWitt, JJ., concur.