**OSBORNE et al. v. LOEW'S HOUSTON CO.**

No. 3369.

Court of Civil Appeals of Texas.
Beaumont.

Nov. 4, 1938.

Rehearing Denied Nov. 9, 1938.

Sewall Myer and Lewis Fisher, both of Houston, for appellants.

Baker, Botts, Andrews & Wharton, of Houston, for appellee.

WALKER, Chief Justice.

In the lower court appellants, Mrs. Kate Osborne, and her husband, were plaintiffs, suing appellee, Loew's Houston Company for damages for personal injuries suffered by her as the proximate result of a fall in the loge section of the balcony of Loew's State Theatre in Houston. From a judgment in favor of appellee, rendered on an instructed verdict, appellants duly prosecuted their appeal to the Galveston Court of Civil Appeals; the case is on the docket of this court by order of transfer by the Supreme Court.

We do not make a statement from the pleadings of the parties; it is sufficient to say that appellants' pleadings support in their favor every inference arising on the evidence. In reviewing the evidence as against the instructed verdict, we recognize that it was the duty of the trial court to accept as true all evidence supporting appellants' theory of liability, and to resolve in their favor every reasonable inference on the evidence, and to give the evidence its strongest probative force in favor of appellants. In due recognition of these fundamental principles, we make the following statement of the facts of

the case, questions and answers reduced to narrative:

Miss Billie Russell testified: "On the evening of May 1, 1936, in company with appellant, Mrs. Osborne, and her niece, Miss Harris, I went to Loew's State Theatre on Main Street in Houston. Well, we purchased the tickets for the loges, and, of course, walked up the stairs, and then a boy looked at our stubs. You see, they have two parts upstairs, and he looked at our stubs and then we started searching for seats and Miss Harris was in front of us, Mrs. Osborne and me, and she walked over to one aisle ahead of us, and, as I recall, signaled to us that she had found some seats; it happened to be rather crowded. We walked over to the aisle she was going down; which aisle it was, I don't recall. It was the center aisles in the theatre going down into the loges; I think it was the one on the right. Mrs. Osborne and I, Mrs. Osborne leading, went to the point at the head of the stairs; Miss Harris ahead of us had gone down the stairs two or three steps. Walking down the stairs—the aisle between the seats—Miss Harris discovered three seats and motioned for Mrs. Osborne and me to come to her. As we started to walk down the steps to the loge seats we were seeking, there was not sufficient lights to see the steps. I couldn't see any steps. As a matter of fact, I recall very definitely feeling my way down the steps, a sort of groping around for the seats. It was quite dark in there, I remember; when I get into a dark theatre I feel with my feet, and I remember definitely feeling my way along and that Mrs. Osborne was immediately down in front of me and she was trying to find where the seats were. From the point where we started down the steps into the loge section, I could not see the loge seats. I couldn't tell just where they were. It was so dark down in there, the only way I could tell was to feel my way from seat to seat. I simply groped my way down. Well, as I previously stated, when I get into those dark theatres, and I did on that occasion, in order to avoid falling, I feel with my feet. Some people feel with their hands on the back of the seats. You can do that all right, but you are liable to touch somebody on the head, and I feel with my feet. You could see the heads all over the theatre, but I had to feel along with my feet, because it was unusually dark and I could hardly see Mrs. Osborne in front of me. When Mrs. Os-

borne fell she was about three steps from me. She was a little ways ahead of me, and was going on down, and I was behind her and she was some two or three steps ahead of me, I would say. The first intimation I had that she had fallen, I heard some sort of commotion, and I started searching for her, naturally, and discovered that she had fallen, and some men were helping her up. She fell on the left side of the aisle by a chair—where the chair was sitting on the left side of the aisle. The chairs at that point are movable and she seemed to have fallen down—the end drops down like this, and she seemed to have fallen down on this corner at the drop-off there. I didn't see just how she fell. There is no railing there to hold to as one goes down those dark steps; it was so dark I do not recall whether or not there was a carpet on the floor. I go to the theatre about once a week. As we started to our seats, the picture was being exhibited and the theatre was dark. I had been in that theatre when it was lighter than it was on that occasion."

Miss Harris testified: "On May 1, 1936, about 7 P. M., my aunt, Mrs. Osborne, and Miss Russell and I entered Loew's State Theatre in the City of Houston. We bought our tickets and went up stairs to the loges, and the theatre was quite crowded and it was very dark, and my Aunt and Miss Russell were behind me and I was looking for seats, and we passed the first aisle and went to the second aisle and I saw some people get up, and I started down the steps and found a seat and motioned them to follow me, that there were two vacant seats. The steps I refer to are the steps that lead down to the loges. I wasn't able to see these steps at all. I had to grope my way down from this landing here by feeling from the back of one chair to the other and easing my foot off of one step to the other. I was not able to see the steps, I just had to grope by feeling my way down. There was a carpet on the floor. The steps down the loges were black; it was so dark I had to put my hand from the back of one chair to the other to feel my way down. We could not see the risers on the steps, but I had to ease my foot from one step to the other. I beckoned to Mrs. Osborne and Miss Russell to follow me down the aisle. I was in front, Mrs. Osborne was behind me, and Miss Russell was behind Mrs. Osborne. Some people got up and left their seats; that was when I beckon-

ed for them to follow me. Mrs. Osborne went down about two steps before she fell. It was not light enough to see how she happened to fall, or what made her fall. I first saw and heard her fall. There were no ushers to assist us in getting down the steps, but at the head of the stairs, on the opposite side, there was an usher who took our ticket stubs, but he did not accompany us down the steps. We did not ask him to accompany us down the steps, nor did we ask for an usher to show us down the steps to our seats. There was no railing along there to assist us as we walked down the steps; I put my hand on the back of each chair as I was going down. The chair Mrs. Osborne meant to take had been moved; when I went to help her, her seat had been pushed back, and she sat down in the place where the chair should have been. All the theatres are dark while the pictures are being exhibited, but some are lighter than others. I had been in the loge section of that theatre a good many times before, and it was lighted just about the same—just about as it was lighted on this occasion. Just about the same as to the dim light that comes from above, but the stairs are as black as night. After you have been in the show 20 or 30 minutes, your eyes become accustomed to that darkness, but the stairs as you go in are as dark as pitch. We were anxious to get our seats and did not wait for our eyes to become accustomed to the darkness. Someone had gotten out of the seat Mrs. Osborne took. Mrs. Osborne was in full possession of her faculties; one of the most active persons I know, and she didn't need an usher."

Appellant Mrs. Osborne testified: "I was about sixty-seven years old on the 1st day of May, 1936. On that date I was acquainted with Loew's Theatre and its general arrangement. (Mrs. Osborne gave the same general testimony about buying the tickets, entering the theatre, and walking up the steps to the second floor, stating that they were going to the loge section because the seats there were more comfortable.) As I proceeded down the aisle to get my seat I was to the left. As I went down the aisle towards my seat this is what I did: Well, there was one vacant chair down here and two back here, just behind this; well, the girls took the two in the back and left me to take the front seat. I sat alone, or was going to sit alone, and that was on the left. And so I got down to my seat, and turned to the left. I was pretty close to the rail in front of the loge seats—two or three seats from the railing. (Witness was referring to the balcony railing; her statement was that there was no railing on either side of the aisle as she walked down the steps to the vacant seats.) When I got to the point where I wanted to get a seat, this happened: Well, I knew that this seat was taken, and I was reaching for a seat, and I thought all of the seats were stationary in that place, and I was following the steps on down, just walking down the steps, and, when I got to this vacant chair, it was moved about eight or ten inches, I imagine, because I fell into the aisle there. When I stepped into the aisle to take the seat, the chair wasn't there, and I missed it, and I fell and I hurt this leg. The chair should have been next to the aisle—the chair I was preparing to take—by the side of the aisle, but it was moved from that space. I was depending on the chair being where it should have been, in its place by the side of the aisle. I was walking down the line of that space, thinking that all of the chairs were in line. This one was out of line, and left a hole there that I fell into, because the chair was moved. As I walked towards my seat, the floor of the aisle was not level—there were steps going down. It was very dark, and there was not an usher anywhere to be seen. There was no railing or cord or anything to keep me from falling into the place from which the chair had been moved; the chair that I was fixing to take was the only vacant chair—the only vacant space. There were two rows of chairs—two rows to the balcony railing. The chair I was fixing to take was not on the same level as the seats in front of me—the steps let down to a lower level. I had been in the loge section of this theatre many times before; everytime before when I used the seats in this section, the chairs were always in place. I did not know that the chairs were movable. I do not recall that there were any lights along the floor near the chairs to guide the patrons in finding seats on the lower part of the floor; all I remember is that it was so very dark it was hard to see, and I could only see the outline. When I went to this theatre, I had not received any warning or any notice of any kind that the chair I was preparing to take was not in its customary place. There

was not sufficient light for me to see that the chair was not in its customary place. I have been in Loew's balcony and the loge section a great many times, and I knew there were no railings down the aisle. As I walked down the aisle towards the seat I was preparing to take, I did not look for a guard railing—I never looked for a guard rail down the middle of the aisle. As I walked down the aisle I was fully conscious that I was not holding to a guard rail. As my friends and I were walking down the aisle together, they said, There is one seat there, and two seats here.' (Witness was referring to the fact that she was to take the seat in front of the two vacant seats to be taken by the two young ladies who were with her.) After we got up to them we could see the vacant seats down at the lower part of the loge section. The girls told me they were there, and I knew they were going to sit at the back and I was going to sit at the front; she said, 'There is a vacant seat in front.' As we were walking down the steps I could not see them. I just had to take it for granted that the steps were there. I couldn't see the steps, it was just that dark; they are systematic, one right after the other. The theatre that night was about as dark as it ordinarily is when the show is being shown on the screen. I don't know whether or not there were lights burning at the place I fell on the side of the aisle—any floor light or anything of that kind—I don't remember. If they were there, they didn't throw the light up so that I could see that the chair was moved; and if there had been a light on the chair that was moved, I would have seen it and it would have given me warning. In those theatres they usually have an usher with a flashlight, who guides one down and flashes the light around and shows where you can go. I did not see any of those ushers up there that night. I did not see any of them in the back of the building that night. I did not see any of them in the aisle as I walked down the aisle. None of them came with a flashlight to help me down the aisle. After I got up in the balcony, I didn't wait any length of time for my eyes to become accustomed to the darkness. I went directly to this aisle and tried to find a seat. I didn't know how far it was from the back of the theatre where I first started down the incline to where I fell, but it seemed quite a little ways. I walked down the aisle slowly, sorta feeling my way along. I didn't see any flashlights there at all that night."

### Opinion.

Appellants predicate their points of error on the theory that the evidence raised against appellee issues of negligence in the following respects:

■ (A) The absence of a guard rail or some other adequate protection on the sides of the aisle leading from the top of the stairs down to the loge section of the balcony: This contention is overruled. There was no evidence that such a guard rail or protection was usually installed in theatres as a part of the general construction. Under the evidence, it would seem that a guard rail would have destroyed the use of the seats appellants were seeking. With a guard rail, how would a patron of the theatre have stepped from the aisle into the seats on the side of the aisle? Certainly, there was no evidence that appellee, in constructing its theatre departed from the usual method of construction in this respect. Lattimer v. Texas & Pacific R. Co., Tex.Civ.App., 106 S.W.2d 727.

■ (B) The absence of floor lights in the aisle: There was no testimony that appellee did not have floor lights; the testimony was simply to the effect that floor lights were not burning. There was no testimony that, in the construction of theatres of the character of Loew's theatre, floor lights were installed. On the contrary, the testimony was to the effect that ushers with flashlights directed patrons to their seats. The evidence did not raise the issue of negligence in this respect. Burke v. State Fair of Texas, Tex.Civ.App., 93 S.W.2d 765, supports this conclusion. In the case at bar, as in that case, if appellee was required to have lights in the aisle, the evidence did not raise the issue that lights in fact were not installed, or actual or constructive notice to appellee of the fact that the lights were not burning. McKelvy v. Capitol Amusement Company, La.App., 159 So. 143; Givens v. De Sota Building Company, 156 La. 377, 100 So. 534; Suggs v. Saenger Theatres, Inc., 15 La.App. 142, 130 So. 817; Gray v. Fox West Coast Service Corporation, 93 Mont. 397, 18 P.2d 797; Texas and Pacific Railway Company v. Howell, Tex.Civ.App., Eastland, 117 S. W.2d 857; Decker v. Brooklyn Strand Theatre Corporation, 249 N.Y. 580, 164 N.E. 591.

(C) The failure to furnish Mrs. Osborne an usher to direct her to a seat: Negligence was not shown in this respect. As a patron of this theatre, Mrs. Osborne knew that, occasionally, ushers were furnished. On this particular occasion no usher was present; no usher was asked for by her; and she did not wait for her eyes to become adjusted to the darkness. If an usher was needed, she knew that need as a patron of the theatre, and, on her own choice, proceeded to find a seat without asking for an usher. Certainly, appellee cannot be convicted of negligence in this respect, when appellant proceeded to her seat without asking for the services of an usher. Perry v. Loew's Boston Theatres Company, 291 Mass. 332, 197 N.E. 54; Loew's Nashville & Knoxville Corporation v. Durrett, 18 Tenn.App. 489, 79 S.W. 2d 598; Montfort v. West Texas Hotel Company, Tex.Civ.App., El Paso, 117 S. W.2d 811; Doran v. United States Bldg. & Loan Ass'n, 94 Mont. 73, 20 Pac.2d 835; Falk v. Stanley Fabian Corp. of Delaware, 115 N.J.L. 141, 178 A. 740.

(D) In having moved or misplaced one of the chairs: The testimony shows that these chairs were movable. True, Mrs. Osborne testified that she did not know that fact. However, the fact was not concealed from her; it was openly visible to the public using these chairs that they were movable. The chair in issue had been occupied by a patron immediately before Mrs. Osborne sought to use it. It is not shown that appellant had any opportunity whatever to discover that the chair had been moved, and to warn Mrs. Osborne that it had been moved. Under the evidence, the conclusion is compelled that this chair was moved only a moment before Mrs. Osborne sought to use it.

(E) In failing to warn Mrs. Osborne, or to give her some character of notice, that the chair had been moved: What we have said under point (D) answers this point.

Appellee was not guilty of negligence in any of the respects charged against it by appellant. Appellants cite Henry v. Publix Theatres Corp., Tex.Civ.App., 25 S.W. 2d 695, as controlling. That case is not in point since it presented the issue of a structural defect; the defect in issue was permanent, and not a mere temporary condition such as we have in the case at bar. Appellants also cite the following additional cases, which are so clearly distin-guishable on their facts that it would serve no useful purpose to review them: Texas Consolidated Theatres v. Pittman, 5 Cir., 93 F.2d 21; Burke v. State Fair of Texas, Tex.Civ.App., 93 S.W.2d 765; Jones v. Jones, Tex.Civ.App., 41 S.W.2d 496; Haskins v. Panhandle R. Co., Tex.Civ.App., 89 S.W.2d 831; Morten Inv. Co. v. Jordan, Tex.Civ.App., 57 S.W.2d 887.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.